McKIE LIGHTER COMPANY

v.

CITY OF BOSTON.

Civ. A. No. 71-2671.

United States District Court,
D. Massachusetts.

Dec. 30, 1971.

Leo F. Glynn, Glynn & Dempsey, Boston, Mass., for plaintiff.

Lawrence J. Ball, Asst. Corp. Counsel, Boston, Mass., for defendant.

## OPINION

WYZANSKI, Senior District Judge.

This case arises from the complaint of a tug owner seeking an injunction to require the City of Boston to open regularly its swing bridge over navigable waters so that the owner may reach his berth.

For many years McKie Lighter Company has operated a fleet of tugs and other vessels customarily moored at a pier adjacent to the bank of the Fort Point Channel inland of the Northern Avenue Bridge. The City of Boston owns and since 1905 has operated, with the authority of the United States, that swing bridge which spans the navigable waters of the Fort Point Channel.

As of September 27, 1971 the Coast Guard, Department of Transportation, had in effect regulations requiring the owner of that bridge to "provide in the proper mechanical appliances for the safe, prompt, and efficient opening of the draws for the passage of vessels" [Part 117.75(b) of Title 33 of the Code of Federal Regulations] and stipulating that the draws of the bridge "shall not be required to be opened for the passage of vessels [such as McKie's] whose

draft is less than 18 feet between 7:00 and 9:00 a. m. and 4:30 and 6:30 p. m., except on Sundays and legal holidays observed in the locality." *Ibid*, Part 117.75(i) (1). The Coast Guard amended those regulations, effective December 17, 1971, to stipulate that "From 6 a. m. to 8 p. m. the Northern Street bridge draw shall open on signal, except that it need not open from 7 a. m. to 9 a. m. and from 4.30 p. m. to 6.30 p. m., Monday through Friday, excluding legal holidays, for the passage of vessels whose draft is less than 18 feet. From 8 p. m. to 6 a. m. the draw need not open for the passage of vessels." [Part 117.75(i) (2) of Title 33 of the Code of Federal Regulations. Federal Reg. vol. 36, No. 222, November 17, 1961.]

September 27, 1971 Mobile Excavating Corporation's truck struck and severely damaged the bridge. The same day, the City's representatives examined the damage and the next day made such temporary repairs as were practical. Thereafter, on each occasion when the City opened the bridge there was, as there still is, a continuing substantial risk that it can not again close the bridge. If the bridge were to be incapable of being closed, there would be serious inconvenience to the public vehicular and pedestrian traffic because transportation between downtown Boston and South Boston depends exclusively on the Northern Avenue Bridge, the Summer Street Bridge, to which access is partially impeded due to highway construction, and the Congress Street Bridge.

After September 27, 1971 the City formulated plans for the permanent repair of the Northern Avenue Bridge. December 6, 1971 the City advertised proposals for repairs to the bridge. December 16, 1971 the City opened the bids, of which the lowest, $44,968.25, had been submitted by J. L. Caputo Construction Co. Inc. Before Christmas the City awarded the permanent repair contract to Caputo. Under the contract's terms, "The work is to be commenced on a date specified on a written order from the Commissioner [of Public Works of the City of Boston] and shall be fully completed within two (2) months from that date." "The bridge, although damaged, can be opened for emergency water traffic and shall be maintained in this operable condition until such time as it is necessary to effect repairs to the swing span. The length of inoperable time of the swing span shall be minimized to the maximum extent possible, but in no event is to exceed three (3) weeks." The contract also requires double shifts six days per week.

At the time the bridge was damaged on September 27, 1971 and for some weeks thereafter McKie did not desire frequent passage for its vessels because of a longshoreman's strike. Between September 27, 1971 and the date complaint was filed on November 19, 1971 the City opened the bridge at least five times for McKie, so that McKie could moor its vessels or respond to business opportunities, but the openings were delayed usually for hours, at least once for almost a day, and sometimes only after McKie established contact with city officials. Due to those delays, McKie alleges it has suffered up to now financial losses which it estimates at roughly $8,500, a figure which this court does not believe is an accurate representation. The City has made its own property outside the bridge available, apparently without charge, to McKie for temporary moving and has promised McKie to open the bridge, except presumably during the three weeks when the swing will be inoperable, in case of a grave emergency, such as severe weather conditions or an extraordinary call for services inland of the bridge. But this arrangement is unsatisfactory to McKie because an outside mooring exposes its equipment to great dangers especially in the winter months, because it has no place to unload its bulldozer, and because it desires ready access to its property inland of the bridge.

McKie filed in this court November 19, 1971 a complaint praying that the City "be ordered and enjoined to make immediate repairs to the bridge and

take all other procedures necessary to restore the bridge to its normal operation in accordance with the applicable statutes of the United States [particularly 33 U.S.C. § 491 et seq.] and to allow free and complete navigation of the navigable waters of the Fort Point Channel and such further relief as the Court may direct."

The first issue is whether this court has jurisdiction to issue the injunction sought.

■ Jurisdiction exists by virtue of the federal question statute, 28 U.S.C. § 1331. The City concedes that more than $10,000 is involved in view of the predictable as well as the experienced losses to McKie. The complaint alleges that the City's refusal promptly to open the bridge violates 33 U.S.C. § 491. Other federal laws which may be involved include 33 U.S.C. § 401 et seq., 494 and 495 and 33 C.F.R. § 117.75. Thus, for example, 33 U.S.C. § 494 provides that no bridge of the character of the Northern Avenue Bridge "shall at any time unreasonably obstruct the free navigation of the waters over which it is constructed." This statute and the regulations relevant thereto create "by implication a cause of action . . . for any person, or at least for any ship, injured by their breach" Petition of Kinsman Transit Co., 338 F.2d 708, 718 (2nd Cir., 1964); Nassau Electric R. Co. v. Riegelmann, 123 Misc. 3, 205 N.Y.S. 81 (1924) because such person is within the class of beneficiaries for whom the protection of that statute and those regulations was intended.

Jurisdiction also exists because this is a "civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333. This court is mindful that it has frequently been stated by secondary authorities that admiralty has no jurisdiction to issue an injunction. E. g., Benedict, Admiralty, 5th ed. § 70; Gilmore & Black, The Law of Admiralty (1957) p. 37 et seq., Moore, Federal Practice, vol. 1, p. 650. But see the criticism of this doctrine expressed in thoughtful scholarly articles such as Morrison, The Remedial Powers

of the Admiralty, 43 Yale L.J. 1 (1933), and H. Zobel, Admiralty Jurisdiction, Unification, and The American Law Institute, 6 San Diego L.J. 375, 394 (1969). Moreover, few federal cases have squarely so held, e. g. Khedivial Line, S. A. E. v. Seafarers' International Union, 278 F.2d 49 (2nd Cir., 1960); Marine Cooks & Stewards, A.F.L. v. Panama Steamship Co., 265 F.2d 780, 784–785 (9th Cir., 1959); and Streckfus Steamers v. Mayor and Aldermen of City of Vicksburg, 10 F.Supp. 529 (D. Miss., 1935), aff'd. 81 F.2d 298 (5th Cir., 1936). However, even when they were decided, those cases were not clearly right. It is indubitable that, in a spirit quite contrary to Swift & Co. Packers v. Compania Colombiana Del Caribe, 339 U.S. 684, 689, 70 S.Ct. 861, 94 L.Ed. 1206 (1949), they overbroadly interpreted Schoenamsgruber v. Hamburg American Line, 294 U.S. 454, 55 S.Ct. 475, 79 L.Ed. 989 (1935) (which indeed left undisturbed a lower court's injunction, and merely held that it was unappealable, although Butler, J., somewhat incautiously used *obiter dicta* at pp. 457–458, 55 S.Ct. 475, 79 L.Ed. 989 capable of being misunderstood) and The Eclipse, 135 U.S. 599, 10 S.Ct. 873, 34 L.Ed. 269 (1890) (which does not address itself to the admiralty's power to enjoin an admittedly maritime tort). And it is at least arguable that those lower federal court cases did not correctly interpret the effect in 17th, 18th and early 19th century England of the rivalry between the admiralty courts and the courts of equity and common law which centered on conflicting claims affecting jurisdiction over commercial maritime contracts, maritime partnerships and other disputes not involving restraints against continuation of exclusively maritime torts. At various pages in volumes V and XII of Holdsworth's History of English Law the relevant early cases are narrated.

Whatever may have been the situation before the 1966 unification of admiralty with other civil actions, today a United States District Court in an admiralty

controversy has power to issue an injunction restraining a maritime tort. F.R.Civ.P., Rule 1 (1966), and commentary thereto. Compare F.R.C.P. 9(h), 38(e) and 65. See A.L.I., Study of the Division of Jurisdiction between State and Federal Courts (1969), p. 226; Colby, Admiralty Jurisdiction, 50 Geo.L.J. 1258, 1268 (1966); Barron and Holtzoff, Federal Practice and Procedure (114 Wright Supp.1968). Every reason of policy supports the jurisdiction. History, if it really be against the policy, has no significant contrary claim because it has been repudiated in the land of its origin since the Judicature Act of 1873, 36 & 37 Vict. c. 66 (1873), and because in any event so far as concerned the issue as to which court should issue an injunction there was no greater interest than the petty jealousies of rural royal tribunals.

■ On the merits, McKie has the obligation to show that the City has committed a tort or a breach of duty under a statute or regulation.

■ So far as concerns the statute, the general duty imposed upon the City is merely not to *"unreasonably* obstruct the free navigation of the waters over which it is constructed." [Emphasis added.] Here the City diligently proceeded to inspect the damage done to the bridge and to repair it temporarily. It may have been slow in planning its permanent repair, but the evidence does not show what would have been a reasonable time for drawing plans and specifications. By now the City has finished the planning and let the contract, which has admirable provisions for quick performance. If the City were unreasonably slow in some intermediate stage, the breach of duty is not continuing, nor likely to be renewed, and hence injunctive relief is inappropriate. Moreover, for this court now to order the City to open the bridge on demand before it has been repaired would involve a substantial risk that the bridge could not thereafter be closed and the public would be gravely inconvenienced.

With respect to the regulations, the only affirmative command is to "provide mechanical appliances for the safe, prompt, and efficient opening of the draws for the passage of the vessels"; the other parts of the regulations are limitations on that command. Here, as explained in the preceding paragraph, the command is being fulfilled, and there is nothing further to be covered by an injunction.

So far as concerns the tort claim, it should be noticed that the duty resting on the City may have been authoritatively defined by the statute and regulations. In any event, there not being any continuous or threatened breach of the statute, regulations or uncodified law, there is no occasion for injunctive relief.

■ If it be suggested that, apart from statutes and regulations, the City has a duty not to obstruct navigable waters, and that the statute and regulations do not authorize any obstruction but merely serve as a defense if the bridge is operated as therein provided, and that the City has blocked McKie in a way not affirmatively authorized, the suggestion is without merit. The City does not have an absolute duty not to obstruct navigable waters. If by not opening the bridge on demand it has obstructed McKie's use of the water it has done so to assure the continuous availability of the bridge for vehicular and pedestrian traffic and its preservation of that public interest serves as a justification of any prima facie tort liability to McKie.

One point remains. Plaintiff's prayer does not specifically seek monetary damages. Recovery of such damages is not even fairly implied in the complaint. There is, therefore, no need to consider whether the delay in letting the permanent repair contract caused McKie damages.

Complaint dismissed with costs.