**John PINO et al., Plaintiffs,**

v.

**PROTECTION MARITIME INSURANCE COMPANY, LTD., et al., Defendants.**

Civ. A. No. 72–3396–C.

United States District Court,
D. Massachusetts.

June 29, 1978.

Morris D. Katz, Boston, Mass., for plaintiffs.

Solomon Sandler, Sandler, Sandler & Laramee, Gloucester, Mass., for defendants.

## OPINION

CAFFREY, Chief Judge.

This civil action came before the Court for a non-jury trial on the issue of liability. Three of the original plaintiffs, Austin Ells, Roy Conrad, and George Spoon, Sr., died prior to trial. Their claims are being prosecuted by representatives of their estates. In addition, two of the original plaintiffs, Paul Scola and Matteo Militello, have withdrawn from the case at their own request. With the exception of Basil Catalini, the ten remaining plaintiffs are commercial fishermen and seamen, or were so employed at and prior to the time the case was commenced. Catalini is employed, at least part-time, as a lumper, i. e., a person who unloads fishing vessels. All of the plaintiffs, except Leslie Matthews, are currently residents of Gloucester, Massachusetts, or its vicinity. Matthews now lives in Maine.

Defendant Ernest A. Enos (Enos) is an insurance broker based in Bridgewater, Massachusetts, who has been in the marine insurance business for 20 to 23 years. He testified that he has brokerage offices in Gloucester, New Bedford, Boston, Miami, Brownsville, and Guatemala. Defendant Trans-Atlantic Marine Insurance Company (TA) is a Massachusetts corporation that acts as an insurance brokerage and a marine manager for several insurance companies, including defendant Protection Maritime Insurance Company, Limited (PMI). PMI is a corporation organized under the laws of England and has done business in Massachusetts at all relevant times. Of the remaining nineteen defendants (Boat Own-

ers), each owned, operated, and controlled at least one fishing vessel. Sixteen of the nineteen are Massachusetts corporations with principal places of business in either Gloucester, New Bedford, Boston, Dartmouth, or Fairhaven. Two defendants, Silverio Gaspar and Pearl D. Gaspar, are Gloucester residents who as individuals owned, operated, and controlled a single fishing boat. Admittedly, plaintiffs, as well as the vessels of defendant Boat Owners, are engaged in commercial fishing on the high seas and in the territorial waters of the several states near Massachusetts ports. Their catch, which is unloaded in Massachusetts, is ultimately distributed in interstate commerce.

Count I of plaintiffs' amended complaint charges that defendants have engaged in a civil conspiracy to monopolize interstate trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1, 2, the Robinson-Patman Antidiscrimination Act, 15 U.S.C.A. § 13, and the McCarran-Ferguson Act, 15 U.S.C.A. §§ 1011–15. In substance, it is alleged that defendant PMI, through its marine managers, defendants TA and Enos, offered protection and indemnity (P & I) insurance on fishing vessels and set boat-owner premiums substantially and artificially lower (as much as 50 percent lower in some cases) than the premiums of similar policies underwritten by competitor insurance companies. By this device, defendant PMI allegedly was able to provide insurance for 80 percent of the Gloucester fishing fleet, a market share that plaintiffs characterize as a "virtual monopoly" of the marine P & I insurance issued in Gloucester.

Plaintiff fishermen also claim in Count I that, at some time in the course of their employment, they sustained personal injuries sufficient to support actions at law against the respective boat-owner employers. They allege that after presenting their personal injury claims and being unable to reach any settlement with defendants PMI, TA, and Enos, or their Gloucester brokers and agents, they brought actions under the Jones Act, 46 U.S.C.A. § 688, the general

Admiralty and Maritime Law, and the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901, *et seq.* It is asserted that defendant Boat Owners thereafter refused to allow the litigating plaintiffs to return to work aboard their vessels, because of either the express instructions of PMI or a demand by that company's marine managers and brokers for additional, exorbitant premiums (alleged to be $5,000 in some cases) upon the rehiring of a designated fisherman. Plaintiffs charge that this practice of demanding unreasonable insurance premiums is an unprivileged and illegitimate business practice that has had the effect of making any named fisherman economically uninsurable, and therefore unemployable. Moreover, the added premium device is characterized by plaintiffs as a substitute for PMI's prior scheme of exclusionary insurance endorsements that was permanently enjoined by a Judge of this Court. *Protection Maritime Insurance Co., Ltd. v. Foley*, No. 70–1116–G (D.Mass. Nov. 16, 1971) (final decree).

Count I further alleges that defendant Boat Owners have conspired with PMI, TA, and Enos to create a climate of fear in Massachusetts fishing communities, with the effect of discouraging injured seamen from retaining counsel and enforcing their legal rights. To that end, it is charged that PMI, TA, and Enos have circulated a blacklist among local boat owners and captains, urging that the 146 designated seamen not be employed aboard their vessels. The alleged blacklist is attached to the amended complaint. Each of the plaintiffs claim that, as a result of this conspiracy, defendant Boat Owners refused or discharged them from employment, even though the fishermen allegedly had recovered from their injuries and were fit for sea duty. Plaintiffs claim that the conspiracy has prevented them from securing continuous, advantageous employment on fishing vessels, and caused them to suffer a loss of earning capacity, deprivation of employment rights, and humiliation in their home communities. Finally, plaintiffs assert that PMI, TA, and Enos knew full well the probable results of their conduct, and acted improperly, without any justification or privilege.

Plaintiffs seek seven items of relief under Count I: (1) the entry of a permanent injunction as to all acts by defendants tending to limit the employment or the employability of plaintiffs; (2) a decree declaring that defendants violated plaintiffs' rights by conspiring to attempt to deny the fishermen's constitutional rights; (3) a decree ordering that defendants place no discrimination or impediment in the way of a fisherman or lumper who is seeking employment, and who is otherwise competent and acceptable in his occupation; (4) a decree ordering that all fishermen be treated equally in seeking employment, without regard to any claims filed by them against defendants for personal injuries; (5) the entry of an injunction permanently enjoining defendants from issuing or circulating any lists of fishermen who sought counsel to secure their legal rights; (6) a judgment of $50,000 to each plaintiff, together with costs and attorneys' fees; and (7) treble damages to each plaintiff, together with costs and attorneys' fees.

Count II, which reiterates the allegations in paragraphs one to thirteen of Count I, charges that these same unprivileged and unjustified actions of the defendants violate plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution. Specifically, it is claimed that plaintiffs' freedom of contract under the due process and equal protection clauses of these Amendments has been violated. The relief requested under Count II is identical to the monetary and equitable relief sought under Count I.

Defendants answer that the added premiums were a valid exercise of their privilege to carry on their insurance business free from unreasonable restraint. It is asserted that the boat-owner premiums, in accordance with regular underwriting practice, were increased solely to provide for the extra risk of future injury posed by these particular plaintiffs during the course of admittedly hazardous employment. In support thereof, defendants cite the statements by plaintiffs in their claims or personal

injury lawsuits alleging permanent total or partial disability, similar disclosures in interrogatories, and information concerning the fishermen's physical and moral character, age, and well-being set forth in "settlement sheets" periodically filed by boat owners with defendant insurers. Defendants go on to admit insuring a substantial number of Gloucester and New Bedford fishermen, but they deny possessing an 80 per cent share of the market. Finally, defendants deny all allegations of conspiracy, monopoly, or discrimination.

Jurisdiction is asserted here on the basis of a federal question, 28 U.S.C.A. § 1331, and a civil admiralty dispute, 28 U.S.C.A. § 1333. At the seven-day non-jury trial, the parties called 22 witnesses and introduced 14 exhibits, including correspondence, a handwriting specimen, an insurance endorsement clause, newspaper reports, a prior Massachusetts Superior Court finding and trial transcript, and various depositions and answers to interrogatories. Requested findings of fact and rulings of law also have been submitted. Pursuant to Fed.R. Civ.P. 52(a), I find and rule as follows.

The nub of this case is the role played by defendant Enos and the validity of his admittedly subjective underwriting evaluation of the plaintiff fishermen as grave insurance risks which he claims justifies the imposition of substantial·added premiums on their employers. The starting place for the analysis is a description of the multi-tiered structure and operation of Enos' insurance enterprise.

*Qua* individual, Enos is an insurance broker who also acts as an insurance agent for TA. But as revealed by his own testimony, Enos' conduct as an individual broker is virtually indistinguishable, as a practical business and factual matter, from the actions authorized by TA and PMI. Enos is the president, the general manager, a 90% stockholder, and, by his own admission, the "boss" of the insurance brokerage business carried on by TA. TA directly (and Enos, indirectly) acts as the marine manager and underwriters' agent for PMI. As a marine manager, TA's primary duties are to desig-

nate the vessels to be insured, issue P & I insurance policies on such vessels for PMI, and set premiums commensurate with the insured-against risks. TA operates pursuant to a management contract with PMI, issuing policies only in the name of the latter insurer. Enos' denial of administrative authority for PMI's daily operations is incredible in light of his controlling shareholder status. I do not believe this denial and find he has *de facto* control of PMI. Enos was an organizer of PMI in 1967, and has since increased his equity to a 70–75 percent position of ownership. He testified that his stock in PMI has a value between one-quarter and one-half million dollars. Moreover, Enos, upon examination by the Court, conceded that his majority interest allows him to dominate PMI's Board of Directors and to replace any member who does not do his bidding. He thus controls the decisions and conduct of that corporation, despite the presence of ten other stockholders.

As to market share, Enos admitted, and I find, that he and his firms insure 70 to 75 percent of the Gloucester fishing fleet, as well as 20 to 25 percent of its New Bedford counterpart. Plaintiffs did not prove that these sizeable market shares were improperly obtained. In fact, there was testimony by several boat owners and captains that the regular premiums charged by Enos were quite comparable to those charged by prior competitors who have since abandoned maritime insurance, and by the approximately eight companies who presently insure the balance of the Gloucester fleet.

At dockside in Gloucester, New Bedford, and Boston, TA's insurance policies are administered by "producing" brokers. On a commission basis, brokers Eugene Marshall (now deceased), Ronald Gilson, and Robert Mitchell acted as Enos' agents in Gloucester, performing such duties as submitting prospective business, collecting premiums, preparing loss claims, interviewing personal injury claimants, obtaining medical reports, and, usually with Enos' approval, negotiating settlements of claims against PMI's insureds. Although not TA employees, it is

clear from the extent and duration of these duties that the named waterfront brokers were substantially identified and dealt with by the boat owners, captains, and fishermen as carrying out the mandates of Enos, TA, and PMI. In sum, I find that these brokers were agents with both actual and apparent authority to act for their principals, the defendant insurers.

In terms of the actual operation of this insurance business, a dockside broker would first attempt to convince the owner of a particular fishing vessel that his insurance requirements could be best met by a PMI policy. The broker would then submit a proposal to TA, acting as PMI's underwriting agent, that an insurance policy be issued covering the named vessel. If TA decided to issue the policy, it would determine a regular annual P & I premium to be charged per crewmember. The key factor in setting the regular premium is the loss ratio for the whole Gloucester fishing fleet in the immediate past two or three years, in relation to the gross premium charged for those years. There was some testimony by Enos that, in 1971, $650 represented the lower limits of the regular premium. Other testimony placed the regular premium at $800. This annual premium would be assessed on a pro rata basis, as measured by the duration of a particular crewmember's employment aboard an insured vessel. Such employment might be limited to a discrete voyage or could continue for months. The issuance and basic rate-setting decisions were made by the underwriting department of TA, a department that Enos, after some patently evasive answers, conceded actually consists of himself, *i. e.*, Enos *is* the underwriting department of TA.

Prior to November 16, 1971, Enos, through TA, had utilized an illegal tactic in the conduct of his insurance business. When certain fishermen attempted to ship as crewmembers, Enos issued an exclusionary "endorsement" to the boat's P & I insurance policy, which stated, in effect, that the designated fisherman was not covered under the vessel's policy. Because the boat owners were required to have P & I insurance on each member of the crew as a condition of the vessel's mortgage, the named fisherman would then be turned ashore and, predictably, barred from a steady "site" aboard any vessel insured by Enos. A series of cases was litigated on the issue of whether this practice was illegal and an abuse of legitimate business privilege. The upshot of separate decisions by the Massachusetts Superior Court and the Supreme Judicial Court, and a Final Consent Decree entered in this Court, was a finding that Enos, TA, and PMI had acted with malice and without privilege in impairing those plaintiffs' employment opportunities. Enos *et al.* were permanently enjoined from refusing to provide maritime P & I insurance coverage to any person specifically designated by name in any insurance policy or endorsement thereto. *Protection Maritime Ins. Co., Ltd. v. Foley, supra*; *Pino v. Trans-Atlantic Marine, Inc.*, 358 Mass. 498, 265 N.E.2d 583 (1970) (damages and injunction); *Foley v. Trans-Atlantic Marine, Inc.*, No. 18328 (Essex Superior Court June 18, 1970).

All parties agree that although Enos ceased writing exclusionary endorsements after the federal injunction issued, he then commenced the presently complained-of practice of charging boat owners additional premiums—over and above their regular premium—whenever certain fishermen crewed aboard an Enos-insured vessel. This new plan had several elements. First, for the last six or seven years, the owners of all the vessels insured by Enos, TA, and PMI agreed to send a "settlement sheet" to Enos and TA after the vessel completes any fishing trip. To enforce this procedure, an owner's policy was subject to cancellation if a settlement sheet was not forwarded to the insurers within a few days after the trip was completed. Each settlement sheet disclosed the amount of fish caught, the price of the catch, the gross income received for the trip, a breakdown of the income received by each crewmember for his share of the work performed during that trip, and tax deductions. Most importantly, the settlement sheet contained the name and ad-

dress of every member of the crew who went to sea aboard that vessel for that trip. Upon receiving these sheets, Enos reviewed them with an eye toward learning the earnings of the crew, the whereabouts of the crew and vessel, and, most notably, the presence of any crew members who created, in his sole judgment, a special risk of loss. If any putative high-risk fishermen appeared on the settlement sheet, Enos notified the boat owner that he was carrying a high-risk man and that an additional premium would be demanded if the boat owner wished to continue to include that man in his crew. Enos and TA, however, had no way of knowing who might be a crew member on an insured vessel prior to any given trip.

Enos, acting as TA's underwriting department, made the judgment that certain seamen were bad risks warranting an additional premium. He conceded that he has never consulted with any outside person, expert or otherwise, on loss experience, premium-setting, or any other technical aspect of the insurance business. He further conceded that, in fact, the amount of the added premium boils down to a subjective judgment on his part, which he claims makes the premium commensurate with the risk assumed by the insurance company in "allowing" that man to be a member of an insured crew. Counsel stipulated that the rate of premium is free of any state or federal regulation. *See* Mass.Gen.Laws Ann. ch. 174A, § 4(b) (West 1972). After considerable evasion, Enos also admitted that 24 or 25 fishermen, out of a total insured work force of at least 200 men, were subject to an added premium.

In making his determination, Enos says he weighed such factors as advanced age, health, physical disabilities, moral hazard (*e. g.*, arrests, involvement with the courts), severe drinking habits, the frequency of claims, and settlement refusals. Once a seaman reaches the age of fifty-five he is carefully scrutinized by Enos to determine whether he can continue to function as a fisherman and seaman. The annual added premium is calculated separately for each seaman, and, according to the testimony,

varied from a low of $1,000 to a high of $6,500. An added premium on a seaman would be continued until such time as Enos and TA received some substantiation of a fisherman's claim that Enos' reason for instituting an added premium no longer existed. It is not clear, however, that this facet of Enos' policy was ever communicated to the high-risk fishermen. Only one seaman, not a plaintiff here, was able to produce such evidence. If the added premium was based solely on advanced age, there could never be any reduction or removal of the premium.

To facilitate his own added-premium rate-setting, Enos compiled personal records for the past fifteen or twenty years on all area fishermen sailing on vessels insured by TA. Enos says he relies heavily on the information in these files, and on the occasional input from the waterfront brokers, in deciding to demand an added premium and in setting its rate. The information contained in these files is derived from medical reports submitted to TA in connection with claims against defendant insurers, pleadings in past suits commenced by the seamen, interrogatories and depositions on file as court documents, and investigative reports.

Turning now to the resolution of the liability issues raised by the plaintiffs, I find and rule as follows:

The proof submitted by plaintiffs relative to the antitrust causes of action alleged in Count 1 does not provide an adequate legal basis for holding any of these defendants liable. Plaintiffs have failed to prove the antitrust allegations by a preponderance of the evidence.

■ Plaintiffs have failed both to allege and to prove that defendant insurers charged different premiums, whether regular or added, to separate boat owners who shipped the same seamen. *See Carroll v. Protection Maritime Ins. Co.*, 512 F.2d 4, 9 (1st Cir. 1975). Consequently, the element of price discrimination, essential to any action under the Robinson-Patman Antidiscrimination Act § 2, 15 U.S.C.A. § 13, has

not been established. Plaintiffs' allegations of a restraint of trade and of a civil conspiracy to monopolize, under sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1, 2, likewise have not been proved.

Plaintiffs cite no cases in support of their jurisdictional and substantive claims concerning violations of their freedom of contract and constitutional right to work under the due process clauses of the Fifth and Fourteenth Amendments. It is axiomatic that the state or the federal government must have taken property without due process for a plaintiff to be deprived of rights protected by either of these clauses. *E. g., Ripon Society, Inc. v. National Republican Party*, 173 U.S.App. D.C. 350, 357 n. 16, 525 F.2d 567, 574 n. 16 (1975), *cert. denied*, 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976); *Fletcher v. Rhode Island Hospital Trust*, 496 F.2d 927, 929 (1st Cir.), *cert. denied*, 419 U.S. 1001, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974). Any taking here could only have been accomplished by the defendants, all of whom are private parties. The subjection of the business of the defendant insurers to state regulation is an insufficient nexus to characterize their action as being under color of state law. *See, e. g., Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350–54, 358, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Consequently, I rule that plaintiffs' constitutional claims should be dismissed for lack of state action.

Plaintiffs' remaining legal claim is that defendants' conduct constituted a maritime tort within the admiralty jurisdiction of the Court. In a tort action closely related to this one, the Court of Appeals for this Circuit, focusing on where the impact of the alleged maritime tort occurred, abandoned the strict locality rule based on the traditional navigable waters/land dichotomy. *Carroll v. Protection Maritime Ins. Co., supra* at 5–9. The Court held that a cause of action against the insurer of a seaman's employer for tortious interference with a seaman's present or prospective employment did lie within the admiralty jurisdiction provided by 28 U.S.C.A. § 1333(1). *Id.* at 9. I rule, therefore, that admiralty jurisdiction is well-founded in the instant case.

No federal statute providing a cause of action for tortious interference with a seagoing employment relationship has been brought to the Court's attention. Nor is the Court aware of any federal common law establishing such a theory in admiralty jurisdiction. Mindful of the special concern for uniformity in admiralty tort litigation, *Carroll v. Protection Maritime Ins. Co., supra* at 6, the Court believes that the Restatement (First) of Torts, § 766 (1939) supplies a recognized national standard from which to fashion a controlling principle of substantive federal maritime law. Section 766 provides in pertinent part:

[O]ne who, without a privilege to do so induces or otherwise purposely causes a third person not to

(a) perform a contract with another, or

(b) enter into or continue a business relation with another

is liable to the other for the harm caused thereby.

This conclusion is reinforced by the fact that Section 766 has also supplied the standard of liability in similar cases decided by the Massachusetts courts. *E. g., Pino v. Trans-Atlantic Marine, Inc., supra* 358 Mass. at 503–04, 265 N.E.2d 583; *Owen v. Williams*, 322 Mass. 356, 360, 77 N.E.2d 318 (1948); *Foley v. Trans-Atlantic Marine, Inc., supra*.

Obviously, neither the mere refusal of a fisherman to accept offered work, nor the inability of a seaman to obtain work because of general market conditions, constitutes sufficient grounds for holding either Enos or the other defendants liable to these plaintiffs. The question of liability turns on the validity of Enos' subjective evaluation of the plaintiff fishermen as poor risks, *i. e.*, whether he acted in good faith in applying his rate-setting criteria to each seaman. Enos, through his counsel, disclaims any motive for the added premiums other than covering an increased risk. Given the hazards of fishing duty, Enos may well have been within the bounds of

privileged underwriting judgment if the added premiums were assessed primarily on the basis of advanced age, present physical disability, or severe drinking habits. However, I am convinced, by a clear preponderance of the evidence, that eight of the fourteen plaintiffs were designated as added-premium seamen not for legitimate risk-related reasons but because of their inability to amicably settle insurance claims to Enos' satisfaction, and because of their retention of counsel, filing of personal injury actions, and prosecution of those claims to judgment, as they had every right to do.

By way of illustration of the basis of so ruling, I find that plaintiff Willis Powers is a fisherman from Gloucester who is presently 71 years of age. He has fished for approximately 50 years and has been a captain for about 20 of those years. Powers has submitted only one insurance claim during that time. Enos testified that, since 1971, TA has required an added premium of $1,500 for any vessel shipping Powers. Enos declares that the premium demand and the specified rate are justified because Powers is of advanced age, has a kidney tumor, a hernia, and a groin abscess, and has suffered a lung injury from smoke inhalation. Enos also asserted that he placed Powers in the advanced-age category at the age of 57, judging him then to be "somewhat incapacitated to function as a full-fledged seaman."

Other testimony, however, which I believe, conflicts sharply with Enos' depiction of Powers as an aged seaman still suffering from a variety of disabling ailments. For instance, it was established that Powers' lung injury and hernia operation occurred as long ago as 1966, while his groin abscess was diagnosed in 1967. Powers also was only out of work for three months in 1966 due to smoke inhalation. Defendant insurers' assertion of Powers' physical disability for sea duty is also contradicted both by Powers' own declaration of good health, and by the fact that the owners of the KISMET and the BEATRICE & IDA, two fishing vessels insured by a different maritime insurance company, judged Powers to be a capable and physically-fit enough mar-

iner to appoint him captain of their vessels. In addition, William Mansfield, captain and owner of the fishing vessel SEA BREEZE, testified that Powers was an excellent fisherman whom he would hire at any time, but for Enos' demand through Gilson for an additional premium.

There also was testimony that Powers retained a lawyer when Enos' Gloucester broker, Eugene Marshall, refused to settle Powers' claim for payment of his hospital and physician bills. From the point in time after he secured the assistance of counsel, Powers was denied a site on some 20 fishing boats because of an added premium request or the presence of his name on the alleged blacklist. Since then, Powers has been relegated to only occasional transient sites on vessels insured by Enos. At least one boat captain suggested to Powers that if the latter dropped his case against Enos, the added premium would be removed and Powers would be given a site.

On balance, I find that medical considerations, age, and frequency of claims were not the predominant underwriting factors used by Enos in assessing Powers as a poor risk. The coincident timing of Powers' single instance of retaining counsel and of the imposition of an added premium lead me to the conclusion that the two events were causally related. Therefore, I find that Enos' subjective determination of Powers as a high risk was unreasonable and not an exercise of legitimate business judgment.

■ Plaintiff Robert Nugent is 46 years of age. He has worked as a cook and a deckhand in the Gloucester fishing fleet for approximately 25 years. Enos, relying on information in TA's files, has designated Nugent as a moral hazard, because of his "severe" drinking habits and his irresponsible, "playboy" behavior. At trial, Enos coyly maintained that while an increased premium of $1,250 had been administratively assigned to Nugent, TA had never had occasion to require payment of such a premium from a boat owner. But I find that assessment, without actual payment, was still sufficient to deter Nugent's employment.

Nugent testified that, while aboard the MANUEL P. DOMINGUS, he sustained blood poisoning in both arms. That injury prevented him from working for about six weeks. In the absence of counsel, Nugent refused to discuss with Marshall any settlement for his three missed trips. Upon retaining counsel (but not before), Nugent experienced difficulty in obtaining a fisherman site. Since 1969, his work has been limited to employment ashore as a cook and to random one-shot trips accomplished prior to the return to Enos of a vessel's settlement sheet. According to Nugent, added-premium demands have led to his discharge from at least three boats. The contrary testimony of Captain Dominic Montanino of the CURLEW is simply not credible. Nugent also testified that the present state of his health is excellent and he feels able to work as a fisherman. There is no evidence of record for Enos' alleged opinion that Nugent's independent income made him unreliable.

Accordingly, I find again that TA's increased premium as to Nugent is not based upon age or permanent disability. Nugent's subsequent employment record, as well as the absence of any corroboration of Enos' charge of severe drinking habits, persuade me that this demand for an added-premium was based primarily on Nugent's failure to reach a settlement rather than any moral hazard impairing his capabilities as a seaman.

Plaintiff Michael Vaiarella is 61 years of age. In his 40 years as a fisherman, Vaiarella has filed three insurance claims, all within the last ten years. His usual shipboard job has been as a cook and deckhand. Vaiarella suffered an elbow injury as a member of the crew of the AGATHA & PATRICIA approximately 14 years ago and pursued his claim to trial in this Court. He was unsuccessful in state-court litigation arising out of wrist and hand injuries sustained aboard the MARIS STELLA in 1963.

Vaiarella also received a head injury aboard the SANTA RITA III in 1970. In a related claim filed with TA, he complained of dizziness, pain, and numbness of the head

in May, 1971, and he was out of work for a few months. When Marshall refused to consider any settlement, Vaiarella hired a lawyer. Subsequently, TA, in a letter signed by Enos, notified the owners of the CAROLE & GARY that an added premium of $3,500 would be required for this plaintiff. Consequently, for the past five or six years, Vaiarella has been denied steady employment on at least eight named fishing vessels. Vaiarella testified that the captains of the CURLEW, NATALIE III, and the CAROLE & GARY cited blacklisting and the added premium as reasons. I disbelieve Captain Montanino's denial of making such a statement. Faced with the alternative of paying the extra premium himself or being turned ashore, Vaiarella found himself limited to single-trip sites. The only exception is that this plaintiff obtained a steady site for 1975 on the *uninsured* GAETANO S. Vaiarella has not worked since making two single trips in 1976. He asserts that he is in good physical condition with no present limitations from his prior arm, elbow, or eye injuries. Former boat owner James Russo referred three times in his testimony to Vaiarella's fine abilities as a fisherman.

Contrary to defendant's requested inference from these facts, I find that neither age, past injuries, so-called moral hazards, or frequency of claims provided a sufficient basis for levying an added-premium of $3,500 against Vaiarella. The dates of Vaiarella's injuries, Russo's testimony as to this plaintiff's talents, and Vaiarella's ability to obtain one uninsured steady site, as well as occasional transient sites, are credible evidence of his fitness and capability as a fisherman. Therefore, Vaiarella's two personal injury lawsuits and his inability to settle his 1971 claim emerge as, and I find were, the paramount and improper reasons for his designation by Enos as a "poor risk."

Plaintiff John Pino is 61 years of age. He has been engaged as a fisherman, deckmate, engineer, and captain for 40 years. He filed two insurance claims in that time. He has been unemployed since September, 1976. Pino cut his finger aboard the WILD

DUCK in 1967, so damaging the finger's nerves that an operation was required one year after the accident. Pino declares he now has no physical disabilities of any kind that hinder him from working, and has 90 per cent use of his injured finger. This assertion is not substantially overcome by Pino's prior testimony, in 1969, that the motion of his finger was limited and that he was not 100 per cent at that time.

Pino retained counsel after Marshall refused to provide reimbursement for hospital and physician bills connected with the finger injury. Shortly thereafter, Pino was denied a steady site aboard the ST. ANTHONY because its captain claimed that Pino was on the blacklist. According to Pino, Marshall then informed him that he would not be able to obtain another site in Gloucester unless he discharged his lawyers and signed a release. By refusing to comply with this demand, Pino found himself unable to secure a steady local site, having to fish out of ports as far away as New Jersey, and relegated to work ashore in fish processing plants. I find that Pino was specifically denied employment on six boats, either because of an added-premium demand ranging from $3,000 to $6,500 or the insureds' belief that Pino was blacklisted. Pino, like all the other fishermen, conceded that he had never actually seen a blacklist. As to those boat owners who did not cite the added premium or the blacklist, none gave Pino a substitute reason for turning him away. In some instances, a boat would go to sea one man short, or other men would be hired for the site immediately after Pino was refused a position. While Pino, like other plaintiffs, was not refused a site on the uninsured GAETANO S, he declined employment thereon because in his opinion the vessel was a "junk boat" and a notoriously poor moneymaker. Although Pino refused, in at least two instances, to accept a site, that fact is hardly enough to justify his poor risk designation. It is also noteworthy that at least one captain rated Pino as a first-class fisherman.

In sum, I find that none of Enos' stated underwriting criteria support an exorbitant premium in Pino's case. The added premiums are admittedly not based on either age or the presence of a moral hazard. I further find that Pino's finger injury is not sufficient justification for his poor risk designation, given Pino's credible testimony concerning recovery, the ten years that have elapsed since his injury, and the use of his finger demonstrated in the courtroom. Nor does the filing of two claims mark Pino as a professional claimant. Accordingly, I conclude with respect to Pino, that Enos did not act in good faith or within the bounds of his legitimate underwriting privilege.

Plaintiff Russell A. Thompson is 35 years of age and has been a fisherman for 16 years. He has filed only a single claim and has never been involved in other litigation with these defendants. This plaintiff has often been confused with his older uncle, Russell J. Thompson, who is also a fisherman. Enos denied ever demanding an added premium for plaintiff Thompson, asserting instead that such a premium was assessed against the elder Thompson, whose medical history clearly supported an added premium. But John Shanahan, captain of the VILLANOVA, testified that he turned the younger Thompson ashore upon receiving a letter from Enos imposing an added premium on this plaintiff. Although Shanahan's testimony was introduced by deposition, I find it to be more credible than the contradictory testimony of the financially-interested Enos.

Thompson suffered badly bruised legs and a slight back injury when he fell down an open hatch aboard the MARC ANTHONY in 1969. Although briefly hospitalized, he recovered sufficiently to return to fishing in four or five weeks. Marshall informed Thompson that if settlement of the claim for a month's lost earnings was refused, Thompson would find himself unable to obtain another site in Gloucester or New Bedford. Thompson rejected Marshall's offer of up to $300 as insufficient, and then retained counsel. Subsequently, the younger Thompson was subjected to an added premium ($1,000 in at least one case), and was denied a steady site on five fishing boats, either being rejected outright or be-

ing turned ashore after a single trip. It is uncontradicted testimony that at least three of the captains or boat owners, at some point in time, cited instructions from the insurance company or Thompson's presence on the blacklist as justification for denying employment. Although Thompson claims to be in perfect health, he has been forced to work as a dockside lumper and as a bartender because of his inability to obtain work at sea. One boat captain testified that Thompson, on one occasion, failed to appear at a scheduled departure time. While this suggests that Thompson could be undependable, it does not justify the insurers' imposition of an added premium.

On balance, I find that Russell A. Thompson was the subject of an added premium, and that the premium increase was not supported by advanced age, permanent disability, a moral hazard, or a high incidence of claims. Consequently, I find that defendant insurers acted unreasonably and without business privilege as to Thompson.

Plaintiff Robert Taylor is 53 years of age. In 35 years of fishing, Taylor has filed only one claim. This plaintiff is missing part of his thumb and the third and fourth fingers on his left hand. Taylor claims to have had only one accident, a fractured left wrist, aboard the CURLEW in 1971. When Taylor pressed a claim for his living expenses during recovery, Marshall refused to consider it unless Taylor signed a release. Taylor refused and consulted counsel. After a number of weeks, Taylor returned to fishing and made a single trip aboard the CURLEW. But Taylor was turned ashore when Marshall informed the boat owner that Taylor could not be shipped because he was on the blacklist. Taylor then made four trips on the EMILY BROWN, and then terminated his service for bona fide personal reasons and not as a result of defendants' conduct. After three or four trips aboard the ST. JUDE, the captain notified Taylor that correspondence from Marshall had named him as a bad insurance risk, and that he would be turned ashore because the owners could not afford the added premium. Enos noted in his testimony that there are two fishermen named Robert Taylor and contended that an added premium of $2,500 to $3,000 had been assessed against only the Robert Taylor who is not a plaintiff here.

Plaintiff Taylor subsequently served on a Long Island, New York boat, and made nine or ten trips on a Boston boat, before he, along with the rest of the Gloucester crew, quit because of the burden of commuting to Boston. Taylor has sought employment but has been unable to obtain a steady site on a larger boat because of the added premium. He has refused to seek a site on smaller uninsured boats, and, as a consequence, has worked only as a clamdigger since 1973.

Again, I find the fisherman's testimony more credible than that of Enos. Enos, through his agent Marshall, did prompt Taylor's discharge from the CURLEW and the ST. JUDE. However, I find that some added premium was within defendants' underwriting privilege because of Taylor's unfortunate permanent partial disability, namely, the missing fingers and thumb on his left hand. I further find that defendant has failed to show what added premium would be reasonable in Taylor's case.

Plaintiff Lorenzo Susanno is 40 years of age, and claims to have been a fisherman for the past 30 years. This plaintiff has admittedly been treated by TA as a bad risk requiring an added premium of $1,750. Enos claims that Susanno presents a moral hazard because he has worked under assumed names of actual Gloucester fishermen to avoid taxation.

Susanno suffered a smashed right thumb on the PAULA MARIA in 1971 and was out of work for three months. In 1973, Susanno's thumb had an ingrown nail and grew numb in cold and damp weather, interfering somewhat with his work. Enos testified that "decreased command of his right hand by virtue of his thumb" was the paramount ground for placing an added premium on Susanno. But presently the motion of Susanno's thumb is not impaired, and the only legacy from the injury is a slight scar.

Susanno made no effort to discuss an insurance settlement, but he did retain counsel and unsuccessfully litigated his PAULA MARIA claim before this Court. Although recovered sufficiently to go fishing, Susanno was turned ashore at some point in time by four boats because Enos had imposed an added premium. Most sites that Susanno has obtained have been limited to one to three trips. However, at the time of trial his site aboard the LILO had lasted for seven months. Captain Charles Cavanaugh testified that although Susanno was a highly competent fisherman, the owners of two Enos-insured fishing boats forced Cavanaugh to discharge Susanno because of his inclusion on the insurance-risk blacklist. The impact of Susanno's rumored high-risk designation has even caused him to be turned ashore by two boats that are not insured by TA. I find that Susanno's substantial shipping history subsequent to his injury demonstrates that his thumb has not significantly hampered his fishing abilities. The only moral hazard posed by Susanno is that, under marital pressure, he made a single trip on the CAPE MAY under the name of another Gloucester fisherman in order to avoid taxation. However, taxes were withheld by his employer regardless of Susanno's use of an assumed name. Thus, the only remaining underwriting criterion is the incidence of Susanno's insurance claims. I find that a single and unsuccessful claim for a temporary disability is an insufficient and unprivileged basis for levying an added premium to protect defendant insurers against fraudulent, harassing claims.

The case of Leslie Matthews was submitted on the basis of Matthews' answers to defendants' interrogatories. Matthews was captain of the SAN ANDREA which sank in 1969 off Nova Scotia in a severe storm. Subsequently, Matthews neither lost his Master's License nor was made the subject of any U. S. Coast Guard disciplinary proceedings. Matthews claims that the added premium of $5,000 now assessed against him is retribution by Enos for the sizeable claims paid by the insurers in connection with the loss of the SAN ANDREA. Enos contends that the added premium is justified by Matthews' incompetence. As a result of the defendant insurers' conduct, Matthews was discharged as skipper of the PAUL & MARIA after three trips, was refused a promised position as captain of the THOMAS D., and was also refused employment aboard the BLUE WATERS and the MOTHER FRANCES. He had to move to Maine to find steady employment as a fishing vessel master prior to his 1974 retirement.

Age, physical condition, and moral hazards clearly were not factors in the decision to impose an added premium upon Matthews. On the other hand, the loss of a ship under Matthews' command is precisely the sort of past experience an insurer has the right to consider. But I find, on the basis of Matthews' subsequent employment as a captain and the lack of any disciplinary action, that the added premium of $5,000 was exorbitant, vindictive, and well beyond the bounds of legitimate underwriting privilege.

I am not persuaded that a case has been proved by a fair preponderance of the evidence in support of the claims of the remaining plaintiffs Spoon, Catalini, Conrad, Ells, Testaverde, and Favazza.

George Spoon, Jr., testifying on behalf of his deceased father's estate, could not identify which boats had refused his father employment. His testimony also was vague as to several other particulars, such as the amount, if any, of assessed added premiums. I find that the fact that Spoon Sr. was missing two fingers and a thumb on the same hand presents a basis for some added premium, given the hazards of small-boat fishing and the heightened risk of danger from lessened dexterity.

Enos stated that no added premium had been assessed against Catalini. Catalini's testimony suggested that any work exclusions he experienced had been less serious than that of other plaintiffs. For instance, he has had no trouble lumping on any frozen fish freighters, and, indeed, as a senior lumper, has priority on any job to discharge

fish from vessels. I also find that Catalini's susceptibility to dizziness and possible loss of balance, resulting from an injury in which a hook caught in his left eye, might justify a reasonable additional premium, because looking up or down for periods of time is a common occurrence when a catch of fish or cargo is being unloaded by overhead basket. Moreover, Catalini did not prove the level of any present added premium.

The case of Ray Conrad, who is now deceased, was submitted on the basis of his deposition. Conrad's testimony is riddled with contradictions and uncertainty regarding the identity of the particular vessels and captains who turned him ashore. Moreover, Conrad's three serious injuries and higher than normal incidence of claims provide a basis for an added premium within the scope of an underwriter's privilege. I do not find on this record substantiation of the claimed "forced" nature of Conrad's retirement and change of residence to Nova Scotia. On balance, I conclude that Conrad's deposition does not present sufficient proof of the unreasonableness of Enos' added premium.

Finally, there was no testimony on behalf of decedent Austin Ells, and plaintiffs Salvatore Testaverde and Samuel J. Favazza were not called as witnesses because they were at sea and unavailable. The cases of these last three plaintiffs were submitted on the assumption that the testimony offered by other plaintiff-witnesses provided a representative and sufficient showing that all added premiums levied by Enos were not justified. But since this law suit was never alleged to be, or certified as, a class action, each plaintiff has to prove by a preponderance of the evidence that he was subjected to an unprivileged and unreasonable underwriting determination by defendant insurers. Ells, Testaverde, and Favazza have not done so.

Enos would have the Court believe that the plaintiffs' laziness, not the added premiums, explain their inability to obtain permanent sites. But enough credible evidence was introduced to convince me that eight of the plaintiffs did actively seek shipboard employment. Likewise, I am persuaded that, in most cases, boat owners and captains relied on the added premium as a bona fide reason for denying employment, and not as a subterfuge for turning away incapable or undependable seamen. Similarly, the facts that the fishermen were not members of a union or a particular family, or that a boat's ownership had changed, might explain isolated instances of discharge, but not the general pattern proven here.

Neither Enos nor any of his employees or brokers ever notified a boat owner prior to obtaining a settlement sheet that the presence of certain seamen necessitated an added premium. Enos denies that his internal office list of high-risk fishermen is a matter of public knowledge, either as a general matter or within the fishing industry in particular. Because the prior "endorsement list" attached to the amended complaint is no longer in effect, I find that it does not constitute an actual blacklist for purposes of this litigation. But the communication of the names of the designated fishermen by word of mouth through the closely-knit fishing industry and the barrooms and clubs of the fishing ports, as well as through reports in the local newspapers, belies defendants' formalistic efforts to disassociate themselves from the drastic effect of the additional premiums on plaintiffs' employment opportunities. No fisherman, boat owner, or captain observed the circulation of an actual blacklist. But it is clear, and I find, that even without a written one, those in the fishing industry knew whom the "blacklisted" men were.

It is undeniable, and I find, that the effects of the added premium scheme upon the employment opportunities of Powers, Nugent, Vaiarella, Pino, Thompson, Taylor, Susanno, and Matthews were severe, continuing, and directly caused by Enos' unjustified or exorbitant demands for additional premiums. Of the fishermen who testified, every one that was stigmatized as a high risk found himself turned ashore from several Enos-insured boats. In most

cases, the boat owners relied on the demand for an added premium as the reason for discharge; in some instances, however, the reasons for a refusal of employment were not given or a reference was made to the blacklist. In addition to the loss of an existing job, the turned-away fishermen suffered further refusals of employment from other boat owners (even those not insured by Enos) when their high-risk designation became known by word of mouth throughout the fishing fleet. Their prospects thus were limited to an occasional transient site on an Enos-insured vessel, work aboard a small boat that was uninsured by Enos and generally low-paying, a site aboard one of the few large Gloucester boats not insured by TA, a site aboard an out-of-state vessel, or employment ashore. The net result of the added premium scheme has been a continuing hardship, a loss of employment, a loss of employability, and humiliation.

I find and rule that plaintiffs Powers, Nugent, Vaiarella, Pino, Thompson, Taylor, Susanno and Matthews, as commercial fishermen, had a reasonable expectancy of financial benefit from their existing employment relationships with defendant boat owners and from job opportunities normally available even in the absence of formal contracts of employment. *See Owen v. Williams, supra*, 322 Mass. at 361–62, 77 N.E.2d 318; Restatement (First) of Torts, § 766, Comment c (1939). In finding favorably to these eight plaintiffs, I particularly have in mind the lack of credibility inherent in the interested testimony of the defendant boat owners and broker Gilson. My disbelief of the boat owners' testimony is based on their demeanor, the nature of their testimony, and on the fact that, because of the unfettered freedom Enos had to set their P & I premiums, they were under de facto economic duress to testify favorably to Enos' position in this case. As for Gilson, I accord no weight to his claim that his primary obligation was to the boat owners. Rather, the evidence convinces me and supports a finding that Gilson fully realized that his bread was buttered by TA and Enos, and that his loyalty was to them rather than to an attempt to testify objectively.

I find that Enos, TA, and PMI knew that the consequences of their practice of levying exorbitant added P & I premiums would be the discharge of the designated seamen by the boat owners, and the discouragement of these plaintiffs from seeking legal representation and from prosecuting work-related injury claims under federal maritime law. Restatement (First) of Torts, § 766, Comment e (1939). As a result, the economic pressure exerted on the boat owners by the added premiums constituted a purposeful inducement and cause on the part of defendant insurers to disrupt or abort the relationships of employment at will existing between the fishermen and the boat owners. *Id.* Comments d, j. The added-premium scheme, acting as a substitute for the previously enjoined exclusionary endorsement system, constituted the promise of a benefit, *i. e.*, lower premiums, to the boat owners if they refrained from dealing with the targeted seamen. *Id.* Comments f, g. The Court, however, expresses no opinion on whether defendant insurers acted with malice or ill will, since such a finding is not essential to proof of Section 766 liability. *Id.* Comment m; *see Republic of Italy v. DeAngelis*, 206 F.2d 121, 130 (2d Cir. 1953) (petition for rehearing) (Clark, J., concurring) ("It is clear that the actor cannot excuse himself merely by showing he intended to benefit himself and had no ill will.")

I also rule in agreement with the related opinion of then Superior Court Judge Campbell, *Foley v. Trans-Atlantic Marine, Inc., supra*, that defendants' intentional tortious interference with plaintiffs' employment relationships was not privileged. *See* Restatement (First) of Torts, §§ 767, 769 (1939). The initial burden of establishing a privilege is a matter of defense resting on the insurers. *E. g., Tye v. Finkelstein*, 160 F.Supp. 666, 668 & n. 1 (D.Mass.1958); *Owens v. Williams, supra*, 322 Mass. at 360, 77 N.E.2d 318. They have not carried that burden. The conduct prov-

en here represents more than the mere exercise of an insurer's freedom to set the conditions and rates for his policies. *See* Restatement (First) of Tort, § 766, Comment g (1939). Accordingly, I rule that the added premiums levied on these eight plaintiffs were unreasonable, improper, and, therefore, unprivileged means of protecting the insurers' financial interests.

The defendant boat owners, who were caught in this cross-fire between the insurers and the fishermen, quite naturally considered the extent of the premiums to be paid in selecting their crew members. Maintaining a good crew and obtaining the lowest possible premiums are legitimate and justified business practices in the fishing industry. Consequently, I rule that none of the defendant boat owners purposely interfered with the employment expectancy of the eight plaintiffs; and even if their predictable response to the added-premium requests could be so characterized, the discharges were privileged as proper means of protecting the boat owners' precarious financial position. *Id.* §§ 766, 769(a).

In light of the foregoing, a hearing will be held on the issue of the damages sustained by the eight plaintiffs designated above as having sustained their burden of proof. Pending that hearing, I rule that it is appropriate to grant plaintiffs interim injunctive relief.

In so ruling, I am not unmindful of the dictum contained in the opinion of the Court of Appeals for this Circuit in *Carroll v. Protection Maritime Insurance Co., Ltd., supra,* at 9, to the effect that "because of the historic unavailability of equitable relief in admiralty, the plaintiffs' prayer for injunctive relief cannot be granted even should they prevail on the merits." Any precedential value that that dictum would otherwise have in this Circuit is dissipated by an observation of Chief Judge Coffin, speaking for the Court of Appeals in a subsequent decision handed down in *A & R Marine Salvage v. McAllister Lighterage Line,* 544 F.2d 551, 553 & n. * (1976). There, with reference to the statement "ad-

miralty courts lack this power [to grant injunctive relief]," Judge Coffin stated

In the past we have assumed this point. *See Carroll v. Protection Maritime Ins. Co., Ltd.,* 512 F.2d 4, 9 (1st Cir. 1975). The *Schoenamsgruber* doctrine, however, has been criticized as unnecessarily crippling an admiralty court's power to do justice, see G. Gilmore & C. Black, *The Law of Admiralty* p. 41 (2d ed. 1975), and several Supreme Court opinions subsequent to *Schoenamsgruber* suggest that the limitation may no longer apply. *See Vaughan v. Atkinson,* 369 U.S. 527, 530, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *Swift & Co. Packers, Inc. v. Compania Colombiana Del Caribe, S.A.,* 339 U.S. 684, 691–92, 70 S.Ct. 861, 94 L.Ed. 1206 (1950). Moreover, the limitation may not have survived the procedural unification of admiralty with the ordinary civil action. *See* Colby, *Admiralty Unification,* 54 Geo.L.J. 1258, 1268–69 (1966).

I rule that this observation from *A & R Marine Salvage* leaves the question of the availability of injunctive relief in admiralty cases an open issue in this Circuit. I further rule that, in light of several observations by the Supreme Court and the opinion of the Court of Appeals for the Fifth Circuit in *Lewis v. S.S. Baune,* 534 F.2d 1115, 1120–21 (1976), that issue should be resolved favorably to the exercise of equitable jurisdiction on the facts of this case which cry out for the same. *Lewis* was decided after the procedural unification of admiralty with the ordinary civil action referred to by Judge Coffin in *A & R Marine Salvage, supra.* Recognizing this unification, the Fifth Circuit observed:

We see no reason why the injunctive powers contained in Rule 65, F.R.Civ.P., should be prohibited to the district court sitting in admiralty.

. . . . .

We believe that all courts, both seagoing and landlocked, have inherent power, within certain limits, to control the conduct of the parties who have subjected themselves to the jurisdiction of the

courts. Injunctive relief, where warranted, can be a useful tool to aid a court in controlling the conduct of litigants. *Id.* at 1121.

*Accord McKie Lighter Co. v. City of Boston,* 335 F.Supp. 663, 666–67 (D.Mass.1971), C. Wright, A. Miller, & E. Cooper, 14 *Federal Practice and Procedure* § 3671, at 272–73 (1976).

This ruling in *Lewis* was foreshadowed by the opinion of the Supreme Court in *Swift & Company Packers v. Compania Caribe,* 339 U.S. 684, 691–92, 70 S.Ct. 861, 866, 94 L.Ed. 1206 (1950), where the Court observed: "We find no restriction upon admiralty by chancery so unrelenting as to bar the grant of any equitable relief even when that relief is subsidiary to issues wholly within admiralty jurisdiction. . ." A similar and stronger statement of the same opinion appears in *Vaughan v. Atkinson,* 369 U.S. 527, 530, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962), where the Court stated: "Equity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief. . . ."

Accordingly, an order should enter enjoining the above-described practices.